## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**STEPHEN C. PEIRSEL,**

   **Plaintiff,**

**v.**             **Civil Action No. 3:06CV06**

**COMMISSIONER OF SOCIAL SECURITY,**

   **Defendant.**

### REPORT AND RECOMMENDATION/OPINION

   This is an action for judicial review of the final decision of the Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner") denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. PROCEDURAL HISTORY

   Stephen C. Peirsel ("Plaintiff") first filed an application for DIB on July 22, 2002, alleging disability since September 6, 2000, due to post traumatic stress disorder, herniated disc in his lower back, and a substance abuse disorder (R. 43-45, 56). Plaintiff's date of last insured (DLI) was December 31, 2001 (51). To qualify for DIB, Plaintiff had to establish that he became disabled prior to the expiration of his insured status, i.e., prior to his DLI. 42 U.S.C. § 423(a),(c); 20 C.F.R. §§ 404.101(a), 404.131(a) (2005).

   Plaintiff's applications were denied initially and upon reconsideration (R. 25-29, 32-34). Plaintiff requested a hearing, which was conducted by an Administrative Law Judge ("ALJ") held on February 5, 2004. Plaintiff, who was represented by counsel; Dr. Peter Crain, a Board Certified

Neurologist, Board Certified Psychiatrist, and a Board Certified Forensic Psychiatrist; and Dr. Albert G. Mylod, Jr., a Board Certified Orthopedic Surgeon, testified (R. 696-730). On April 9, 2004, ALJ Richard L. DeSteno entered a decision finding Plaintiff was not disabled (R. 13-20). Plaintiff requested review of the ALJ's decision by the Appeals Council; that request was denied (R. 5-7, 9). The April 9, 2004, decision by ALJ DeSteno, therefore, is the final decision of the Commissioner. Having exhausted his administrative remedies, Plaintiff filed the instant case.

## II. FACTS

Plaintiff was born on May 14, 1945, and was fifty-nine years old at the time of the administrative hearing (R. 699). He has a college education, having completed a bachelor's degree (R. 699-700). Plaintiff's past relevant work included 1) owner of a package good restaurant from 1978 to the early 1990's; 2) owner/president of a restaurant/bar from 1994 through 1997, in which he supervised, managed, hired, and fired personnel; bartended; cooked; waited tables; and 3) materials controller at Litten Industries for two-and-one-half years, ending in September 2000, in which he stood, sat, and lifted (R. 700-03).

On August 18, 2000, Marc A. Cohen, M.D., evaluated Plaintiff for a work-related injury. Plaintiff reported he had injured himself "'lifting 5 gallon pails and stacking them.'" Plaintiff reported to Dr. Cohen that he had had previous back injuries but no other medical illnesses. Dr. Cohen's examination of Plaintiff revealed he was obese, had a normal gait, was able to toe/heel walk, had good range of motion of his lumbosacral spine, and had no pain from flexion to extension. Plaintiff had pain on pelvic rotation, pain on axial loading, and pain on tactile stimulation. Plaintiff could squat and his motor exam was 5/5 (R. 194). Plaintiff's straight leg raising test was negative. Plaintiff's x-ray revealed a degenerative disc at L5-S1 "with significant lumbar spondylosis." Dr.

Cohen diagnosed low back pain syndrome, which aggravated his pre-existing arthritis "without focal neurological deficus entrapment." Dr. Cohen recommended Plaintiff loose weight, exercise at home, and undergo a short course of physical therapy to treat his condition (R. 195).

On September 6, 2000, Dr. Cohen corresponded with Pat Lizzi, R. N., relative to Plaintiff's condition. He informed R.N. Lizzie Plaintiff had "made significant improvements"; that his range of motion of his lumbosacral spine was "very easy"; that Plaintiff had "no paravertebral spasm"; Plaintiff had "no pain on flexion and rotation"; and Plaintiff had "no significant neurological problem." Dr. Cohen wrote his diagnosis was degenerative disc disease which was "resolved and . . . stable." Dr. Cohen opined Plaintiff had reached maximum medical improvement "with respect to acute orthopedic care." Dr. Cohen found Plaintiff could "work his normal shift" (R. 196).

On April 19, 2002, Plaintiff reported to a VA Medical Center in New Jersey (R. 123-24, 198-200). Plaintiff was accompanied by his brother. He reported feeling "'helpless, hopeless & worthless." Plaintiff stated he had suicidal thoughts. He had bought a package of razor blades and planned to get into the bathtub and "'split [his] wrist'" (R. 123). Plaintiff reported he had experienced depression "on and off for several years." He stated he had never been in any VA programs in the past. Plaintiff stated he had experienced financial difficulties in his business, had fallen behind in his rent payments, and had been evicted that morning. Plaintiff denied any suicidal thoughts on that date or any past suicidal attempts. During the interview, Plaintiff was friendly and cooperative; however, Plaintiff was "somewhat vague in giving the reasons why he was seeking inpatient admission without trying outpatient treatment first." Plaintiff's depression was listed as mild; his insight and judgment were noted as normal. It was determined that inpatient treatment was "not going to be much help to" Plaintiff but that he was "a more suitable candidate for [the] DOM

3

program." Plaintiff was referred for DOM screening and was assisted in finding temporary shelter, if needed. (R. 124).

Plaintiff's physical examination at the VA Medical Center on April 22, 2002, was normal except for rectal bleeding and diarrhea due to alcohol consumption, broken teeth, history of tuberculosis, high blood pressure, sleep disturbance, anxiety, depression, and obesity. Plaintiff was prescribed no medications. His treatment plan included attendance of AA/NA meetings, physical therapy, taking multivitamins, taking folic acid, taking thiamin, and adherence to a regular diet (201-08).

On April 23, 2002, Plaintiff underwent a mental health consultation at the VA Medical Center (R. 162-64). Plaintiff stated he was depressed, he had lost his housing, he felt hopeless about his financial situation, he had intermittent suicidal thoughts, he had not heard voices, he had decreased energy, he had a good appetite, he had poor sleep, and he had frequent nightmares (R. 162-63). Plaintiff reported having drunk alcohol one week earlier. Plaintiff stated he drank one pint of gin per day. Plaintiff reported his mood had improved and that he was "future" oriented. Plaintiff had not been hospitalized for psychiatric conditions in the past, but he had been prescribed Prozac ten years earlier, which he took for two weeks (R. 163).

Plaintiff reported a family history of alcohol abuse. Plaintiff had successfully completed an inpatient alcohol rehabilitation treatment program ten years earlier and had not consumed alcohol for four years after that. Plaintiff reported no alcohol-related seizures, blackouts, or "shakes." Plaintiff stated he used no other drugs. Plaintiff reported he had a worker's compensation claim pending for a back injury (R. 163).

Plaintiff's psychomotor activity was normal, he was calm and cooperative, his mood was

4

congruent and appropriate, his affect was restricted in range, his speech was spontaneous and normal, his tone was restricted in range, his thought process was logical and organized, and his insight and judgment were fair (R. 163).

Plaintiff was diagnosed with the following: Axis I: substance induced mood disorder, depressed ETOH dependence; Axis II: deferred; Axis III: hypertension and back pain; Axis IV: homelessness, financial problems, unemployed, and poor social support; and Axis V: GAF 50. Plaintiff was not prescribed medications as he self-reported an improvement in his mood, sleep and appetite since he ceased drinking. Treatment plan was to monitor Plaintiff (R. 164).

On April 23, 2002, the VA Medical Center report read that Plaintiff was sleeping well, was in no distress, was alert and oriented, ambulated with a steady gait, and denied any pain or discomfort (R. 169).

Plaintiff attended open focus groups on April 23, 25, and 26, 2002, at the VA Medical Center relative to alcohol detoxification (R. 168).

On April 27, 2002, Plaintiff's substance abuse counselor at the VA Medical Center noted Plaintiff was "intelligent and insightful and appear[ed] to be utilizing [his] resources appropriately" (R. 167).

On April 30, 2002, Plaintiff reported to Dr. Ami Patel, a psychiatry resident at the VA Medical Center, that he was feeling better, that this was "the best he has felt in the past 5 months," his sleep and appetite were fair, his energy level was improving, and he was "future oriented" and was "looking forward to going to the" domiciliary (R. 166). Plaintiff's affect was constricted, his mood congruent and appropriate, his speech was spontaneous, his thought process was logical and organized, and his insight and judgment were fair. Dr. Patel opined Plaintiff was making progress.

5

She found the following: Axis I: substance induced mood disorder, depressed ETOH dependence; AXIS II: deferred; Axis III: hypertension and back pain; AXIS IV: homeless, financial problems, unemployed, poor social support; AXIS V: GAF 55 (R. 167).

On April 30, 2002, Plaintiff reported to the open focus group for addiction counseling. He was alert, focused, and cooperative. He reported he was beginning to identify with the first step of AA/NA (R. 166).

On May 2, 2002, Plaintiff's addiction counselor reported he was making a "sincere effort at rehabilitation." It was noted that Plaintiff's prognosis was "good" (R. 166).

On May 7 and 9, 2002, Plaintiff attended an open focus group for addiction counseling. His prognosis was noted as good (R. 160).

On May 14, 2002, it was noted at the VA Medical Center that Plaintiff was successful in controlling his high blood pressure with diet and medication. He was transferred to the domiciliary for the long term treatment program (R. 256). Upon transfer, Plaintiff reported he had drunk up to one-fifth of vodka pre week, usually as a binge drinker, had not experienced seizures or blackouts, and had been arrested for driving under the influence. He reported hypertension and low back pain. It was observed he had good motor activity (R. 257).

Also on May 14, 2002, it was noted that Plaintiff's gait was normal, he had good extremity strength, he had been seen by a psychiatrist and found relatively stable, he had skills to identify relapse triggers, and physical therapy and other modalities relieved his chronic low back pain (R. 252-53).

On May 15, 2002, Plaintiff was admitted to the domiciliary "in good condition" (R. 259). Plaintiff reported he averaged several liquor drinks every day, experienced chronic low back pain,

6

and experienced left shoulder discomfort. Plaintiff reported his shoulder pain began in January, 2002, and was relieved by a cortisone injection (R. 260).

On May 20, 2002, a x-ray was made of Plaintiff's left shoulder, which showed soft tissue calcification (R. 173).

On May 30, 2002, Plaintiff underwent a pre-screening for admittance to the PTSD program (R. 288).

On June 24, 2002, Plaintiff reported continued left shoulder and low back pain. Relative to his low back pain, he stated he had no weakness, numbness, or tingling. Plaintiff was not taking pain medications. Plaintiff stated standing for more than six hours worsened his pain; lying in the supine position was "best"; and he was "able to walk as far as he want[ed]" (R. 299).

On June 26, 2002, Plaintiff underwent a MRI of his lumbar spine. It revealed a small disc herniation of the L4-5 and mild degenerative changes (R. 172, 309, 313).

On July 11, 2002, an examination of Plaintiff's lumbar spine revealed no tenderness upon palpation, limited range of motion, pain with flexion, and intact sensation (R. 309). Plaintiff was instructed to undergo physical therapy (R. 310).

On July 15, 2002, Plaintiff reported a decrease in lower back pain with the flexion base lumbar exercises he had begun at physical therapy (R. 311).

On July 22, 2002, Plaintiff reported he was occasionally depressed, but was able to "work through it." He continued to experience nightmares and flashbacks three or four times per week. He continued to experience sleep disturbances and anxiety. Plaintiff was medicated with Wellbutrin (R. 313).

On July 29, 2002, Plaintiff's VA Medical Center records revealed Plaintiff was transferred

into the PTSD program (R. 323). Upon admission, it was noted Plaintiff was alert and oriented. His hand grasps and leg strength were equal and strong (R. 328). His speech was clear. He had right arm limitation and pain (R. 329). He had sleep problems, he exercised, and his appetite was good (R. 330). His physical condition was fair; his mental state was alert; his activity was ambulant; and his mobility was full. Plaintiff required no assistance with his activities of daily living and he required the use of no assistive devices (R. 331). Plaintiff had no suicidal or homicidal ideations, intent, or plans. He admitted to a past suicide attempt (R. 334). Plaintiff's behavior was noted as calm; his speech was normal; his mood was depressed; his affect was appropriate; his thinking was logical; he was not delusional; he was oriented as to person, place, and time; his memory and cognitive functions were intact with no deficits; he showed no evidence of thought disorders or psychosis; his insight was fair; and his judgment was thoughtful (R. 334-37). Plaintiff reported flashbacks, sleep disturbances with nightmares, and survivor guilt (R. 337).

The initial diagnostic impression was as follows: Axis I: posttraumatic stress disorder, chronic, and polysubstance dependence, in remission; Axis II: deferred; Axis III: low back pain syndrome and right shoulder tendonitis; Axis IV: severe; and Axis V: GAF 41 (R. 337). Plaintiff's treatment plan was participation in a forty-five day PTSD program with medication management by a psychiatrist (R. 338).

On October 16, 2002, Plaintiff underwent surgery at the VA Medical Center to repair a tear in his left rotator cuff (R. 363-64, 368-69).

On November 20, 2002, Plaintiff reported his "arm seem[ed] to be getting a little better each day" (R. 371).

On November 21, 2002, Plaintiff denied depression, but reported continued flashbacks and

nightmares. He continued to take Wellbutrin (R. 372).

On December 13, 2002, Plaintiff reported continued improvement with his arm's mobility (R. 373).

On December 17, 2002, it was noted that Plaintiff was awaiting transfer to the Martinsburg, West Virginia, VA facility in January, 2003,and that Plaintiff's depression and PTSD were being managed (R. 380).

On January 20, 2003, Plaintiff was examined by Arthur H. Tiger, M.D. Plaintiff reported his back "continue[d] to be stiff, sore, painful and uncomfortable." Plaintiff stated he could not turn, twist, lift or bend. Plaintiff informed Dr. Tiger he had difficulty squatting and kneeling. Plaintiff described his pain as intermittent and radiating into both buttocks and both hamstrings. Plaintiff stated he had "difficulty doing anything of a strenuous nature." Plaintiff reported numbness in his legs (R. 125).

Dr. Tiger observed "profound loss of the usual lumbar lordotic curvature" of Plaintiff's lumbar spine. He observed hard fibrotic muscle tissue on both sides of Plaintiff's lower lumbar spine. Dr. Tiger noted tenderness to palpation over the L3, L4, and L5 vertebral spinous processes and both SI joints. Plaintiff's forward flexion was sixty degrees and his lateral bend and lateral rotation was forty degrees in either direction. Plaintiff's straight-leg-raising test was positive at forty-five degrees bilaterally. Dr. Tiger opined Plaintiff had the "residuals of a chronic lumbosacral strain syndrome with chronic myofascitis, a herniated disc at the L4-5 level and bilateral radiculopathies." Dr. Tiger found Plaintiff's partial total disability was forty percent (R. 126).

On January 22, 2003, a psychiatrist with the Department of Veterans Affairs, Karen Opdyke, completed a Mental Impairment Questionnaire of Plaintiff. Dr. Opdyke noted she had treated

Plaintiff "intermittently" from July 30, 2002, through September 10, 2002. She listed the following

diagnoses for him: Axis I – chronic posttraumatic stress disorder, alcohol dependence in remission;

Axis II – deferred; Axis III – hypertension and chronic low back pain; Axis IV – severe combat-

relate trauma, homelessness, obesity; Axis V – current GAF forty-one. Dr. Opdyke listed Plaintiff's

signs and symptoms as severe sleep disturbances with frequent nightmares, flashbacks, depression,

and anxiety as a result of combat-related trauma (R. 128). Additionally, Dr. Opdyke found Plaintiff

had mood disturbances, substance dependence, social withdrawal or isolation, flat affect, intrusive

recollection of traumatic experiences, and hostility and irritability. Dr. Opdyke opined Plaintiff was

cooperative and had no psychomotor abnormalities. Plaintiff's speech was relevant and coherent.

His affect was dysphoric and blunted (R. 129). Dr. Opdyke noted that "after successful completion

of 45 day PTSD residential treatment program, [Plaintiff] reported improved coping skills, self-

awareness and anger management." Dr. Opdyke also noted Plaintiff was medicated with Wellbutrin,

from which he realized no side effects. Dr. Opdyke opined Plaintiff's prognosis was fair, that

Plaintiff's impairment had lasted or could be expected to last for twelve months, that Plaintiff's

condition was not exacerbated by any other physical condition, and that Plaintiff did not suffer from

low intellectual functioning (R. 130). Dr. Opdyke opined Plaintiff's impairment or treatment for his

impairment would cause him to be absent from work more than three times per month (R. 131).

Also on January 22, 2003, Dr. Opdyke wrote "Comments" relative to Plaintiff PTSD. She

opined Plaintiff was "unemployable . . . at least for the present and the foreseeable future." Dr.

Opdyke wrote Plaintiff had managed to cope with "the disorder, the symptoms, ie: chronic

depression, anger, isolation, self-medication, difficulty sleeping, nightmares, anxiety, etc." She

opined the combination of Plaintiff's disorder and lower back pain contributed to the loss of his last

job and "played a major roll in his inability to become reemployed." Additionally, Dr. Opdyke expressed the opinion that she "believe[d] that [Plaintiff] should have been admitted to this hospital several years ago for treatment, but no later than the end of the year 2000." Dr. Opdyke wrote that she was not "surprise[d]" that Plaintiff did not enter treatment earlier than he did, "as people with this illness have a tendency to 'tough out' the difficult times trying to appear normal" (R. 127).

On February 3, 2003, Plaintiff was permitted to swim, bowl, bicycle, and participate in activities at the wood shop and the fitness center after his left shoulder (post-surgery) and lower back were evaluated (R. 497).

On May 7, 2003, Plaintiff was released from the Martinsburg, West Virginia, VA facility, having successfully completed the Posttraumatic Stress Disorder Residual Rehabilitation Program (R. 420). The Discharge Summary read that Plaintiff successfully completed the domiciliary program on that date. It was noted in the summary that Plaintiff was "stable and competent during his stay and at the time of his discharge." Plaintiff intended to return to his "home in New Jersey" and to seek psychiatric and medical care at the VA Medical Center in Lyons, New Jersey (R. 388-89). Plaintiff also intended to vacation in Puerto Rico. Plaintiff would be supported by VA benefits, which he had been awarded, in the amount of $2,200 per month (R. 421). Plaintiff's final diagnoses were as follows: Axis I: chronic posttraumatic stress disorder, depression, and alcohol dependence (in remission); Axis II: "0"; Axis III: chronic low back pain, history of rotator cuff tear with repair, history of purified protein derivative; Axis IV: severe, secondary to combat-related experiences; and Axis V: GAF was fifty on admission and fifty-nine on discharge (R. 388-89).

On September 30, 2003, Plaintiff reported to the VA Medical Center in Martinsburg, West Virginia, with complaints of elevated blood pressure. Plaintiff reported he drank an "occasional

glass of wine with dinner" and smoked one package of cigarettes per day (R. 412).

A psychiatry outpatient note was made on October 21, 2003, by Paul S. Mueller. Dr. Mueller noted Plaintiff had stopped Wellbutrin several weeks ago and was interested in medicating with Zoloft. Plaintiff informed Dr. Mueller that he felt depressed at times, but that he felt "'pretty good.'" Plaintiff stated he had a strong support system in place with friends and was living with another veteran in a local apartment. Plaintiff's mood was reported as "'pretty good'"; his affect was neutral; Plaintiff was alert and oriented; Plaintiff reported intrusive thoughts and hyper vigilance (R. 411).

Evidence to Appeals Council

Plaintiff was discharged from Morristown Memorial Hospital, in Morristown, New Jersey, on February 11, 1992, with a diagnosis of alcohol dependency. Plaintiff reported that he had a thirty-year history of drinking, but had considered it a "problem" for the past three years. Plaintiff reported he had been medicated with Prozac for depression for five weeks, but had stopped taking it on January 19, 1992 (R. 544). Upon release, Plaintiff's medical condition was listed as "stable" (R. 545).

While a patient at Morristown Memorial Hospital, Plaintiff underwent counseling. He was found to be "arrogant, self-centered, demanding and self-pitying." Plaintiff asserted he was "basically shy and that this [behavior] was a protective wall he painstakingly built around himself starting in early adolescence" (R. 548). Plaintiff's mental status was found to be as follows: his behavior was appropriate; he was oriented; his mood and affect were normal; his thought process and content were normal; his memory was intact; his intellect was average; his insight, judgment, and impulse control were adequate; and he had no psychotic processes (R. 596).

Plaintiff began individual counseling in February, 1992, for alcohol abuse and marital discord

12

(R. 601). During 1992, Plaintiff attended AA meetings until September of that year (R. 601-34). Plaintiff's loss of his driver's license, lack of a sponsor, and a combination of his "pride" and "ego" prevented him from further attending AA meetings (R. 634). Plaintiff reported to his counselor in October 1992 that, "although he ha[d] times when he would like a drink, he [was] . . . never really tempted" (R. 635). In November, 1992, Plaintiff reported to his counselor that he was "expanding his . . . bar into a restaurant/bar facility and [was] in the midst of construction," which kept him "fully occupied." Plaintiff also stated that with this project, he was "fulfilling a long-time dream." Plaintiff reported he "enjoy[ed] cooking and look[ed] forward to being able to do so creatively for profit" (R. 637). In December, 1992, Plaintiff reported to his counselor he was "feeling good mentally and physically" (R. 638).

Plaintiff continued individual counseling in 1993 for alcohol related issues and marital discord (R. 639-61). He reported in January that he continued to not consume alcohol and he was happy (R. 639). Plaintiff reported in September, 1993, that he had consumed alcohol and was charged with his third driving while intoxicated (R. 645). The counselor noted Plaintiff "never fully accepted what happened to him, always accused 'the system'" (R. 646). In December, 1993, Plaintiff was sentenced to a jail term with a work release for his conviction for driving while intoxicated (R. 567-58).

Plaintiff continued individual counseling in 1994 (R. 661-76). He reported in January of that year that he was unhappy and depressed because of his marriage and because his business was doing poorly. Plaintiff reported in February, 1994, to having relapsed. The counselor encouraged Plaintiff to attend AA meetings. In April, the counselor noted Plaintiff presented with the same complaints about his wife and his business, but continued to resist changes (R. 667). Plaintiff began attending

13

AA meetings in May, 1994 (R. 670). Also in May, 1994, the counselor opined Plaintiff "like[d] to put the blame on other people, other circumstances," such as the motor vehicle laws (R. 671). Additionally, the counselor noted Plaintiff "also touched on some anger which he ha[d] been harboring for years, going back to the Vietnam War. Also some fairly strong feelings of guilt. [Plaintiff] has never discussed these feelings with anyone, thinks he can keep them buried, and he referred to alcohol as one way that worked for him for a long time in helping him avoid facing these feelings" (R. 672). Defendant reported a relapse in October, 1994 (R. 676).

Testimony at the Administrative Hearing

Plaintiff testified at the February 5, 2004, administrative hearing that he had injured his lower back at the end of 1999 or in early 2000 (R. 704). Plaintiff stated his pain was "pretty much constant" and that he medicated it with prescription Naprosyn on "an as needed basis." Plaintiff stated he could sit and/or stand for fifteen to twenty minutes. Plaintiff testified he could walk for approximately twenty minutes to half an hour (R. 705). Plaintiff stated he avoided lifting and carrying, but could lift and/or carry fifteen to twenty pounds (R. 706).

Plaintiff stated he experienced pain in his left shoulder "sometime during 2001." Plaintiff stated the condition of his shoulder was "not bad" and "much better than it was." Plaintiff testified that if he did not "raise it above [his] shoulder . . . it's pretty comfortable" (R. 710).

Plaintiff testified he had been diagnosed with PTSD by the VA and that it had "been affecting [him] for a long time, [he] just didn't know it" (R. 706). Plaintiff stated that after he was terminated from his job, he sought employment throughout 2001 but could not find work (R. 706-07). Plaintiff testified that after he stopped working, his PTSD "symptoms as they'[d] been described to [him] increased considerably. Specifically nightmares, night sweats" (R. 707).

14

Plaintiff stated he lived with a roommate, did not cook his meals, cleaned by "push[ing] the vacuum a few times," did the laundry, and did not drive (R. 709).

Dr. Peter Crain, a psychiatrist, testified at the administrative hearing (R. 711). Dr. Crain had not treated Plaintiff; he interviewed Plaintiff prior to the hearing (R. 712). Dr. Crain testified that Plaintiff told him during his interview with Plaintiff that he experienced "feelings of guilt" about his experiences in Vietnam and that he "explain[ed] his responsibility, if he could have done something differently, that it might have made a difference." Plaintiff informed Dr. Crain that he had been discharged honorably from the military, with no disability, and that he had experienced infrequent flashbacks and nightmares that were not intense and did not interfere with his functioning (R. 713). Dr. Crain testified Plaintiff became depressed when his business started failing, which led him to question whether he was "doing the right thing . . . [w]as he handling things correctly. . . [w]hich [was] in many ways, like a Vietnam experience." Dr. Crain stated Plaintiff began having more frequent nightmares, had difficulty concentrating, began forgetting things, had "trouble dealing with problems," and he became isolated (R. 714). Dr. Crain testified Plaintiff's "post traumatic stress, which [was] in response of the nightmares, flashbacks, insomnia, trouble with concentration, and . . . trouble getting along with people . . . combined with the pain in his back and his shoulder . . . were reasons why he stopped working and could not continue working thereafter" (R. 715).

Dr. Crain testified that it was his opinion that Plaintiff met Listing 12.06 for mental disorders as of September 6, 2000 (R. 716). Dr. Crain found Plaintiff met Listing 12.06 for anxiety related disorders, specifically that he had recurrent and intrusive recollections of a traumatic experience, which was a source of marked distress. Dr. Crain found this fit his PTSD diagnosis. Dr. Crain also found that Plaintiff had two limitations in Category B of Listing 12.06; specifically Number 3, which

15

was for deficiencies in concentration and Number 2, which was for marked difficulties in maintaining social functioning. Dr. Crain opined he thought these limitations "pertain[ed] to [Plaintiff's] PTSD in terms of functioning" (R. 715). Dr. Crain also opined Plaintiff "probably . . . should have been treated sooner than he was (April of 2002)." Dr. Crain testified that, "based upon [Plaintiff's] descriptions" he "believe[ed] [Plaintiff] since the time he got fired in September 2000, he probably should [have] receive[d] treatment . . . . [b]ecause at that point, . . . the problem with concentration were (sic) there, problems with social relating were there. And he had intense nightmares and flashbacks and insomnia, which in themselves interfere with concentration and alertness. So that should have been treated" (R. 717). Dr. Crain testified Plaintiff's condition "first became a problems (sic) since around '95, 96. But it became disabling by the time he got fired in September 2000." Dr. Crain testified he was hired by Plaintiff's counsel to testify and compensated $1,000 therefor (R. 719).

Dr. Albert G. Mylod also testified at the administrative hearing (R. 719). Dr. Mylod identified himself as a board certified orthopedic surgeon and testified on behalf of the Plaintiff at the request of Plaintiff's counsel. Dr. Mylod interviewed Plaintiff prior to the start of the administrative hearing. Dr. Mylod testified that "some of [Plaintiff's] . . . conditions were . . . present and significant before the DLI" and "affected his overall condition" (R. 720). Dr. Mylod stated Plaintiff revealed to him during the course of the interview the following: 1) one of the reasons Plaintiff was fired from his last job was he was absent from work because of back pain; 2) when he was at work, he "would go off to a quiet place and lay down" due to back pain; 3) Plaintiff had a history of back injuries in 2000, but there was "no aggressive medical workup . . . performed at that time"; and 4) when Plaintiff presented at the VA Hospital in 2002, he reported left shoulder pain and

chronic low back pain, which was a rotator cuff tear and a herniated disc respectively (R. 721). Dr. Mylod testified "there was no major trauma" between his date of last insured and the time he was admitted to the VA Hospital. Dr. Mylod testified it was possible Plaintiff injured his shoulder and back when he lifted "some 5,000 pails that were filled with metal" in 2000. Dr. Mylod opined Plaintiff had limitations in his left shoulder and major limitations in his back, which, combined with his mental capacity "quite possibly would lower him to less than sedentary" (R. 722).

At the conclusion of the doctors' testimony, Plaintiff testified that his nightmares were as frequent and "aggressive" in September, 2000, as they were at the time of the administrative hearing. Plaintiff stated his nightmares had "lightened up during the time" he was in the VA Medical Center. Plaintiff described his nightmares as occurring two to three times per week, would cause him to awaken, were very intense, and would cause him to experience night sweats (R. 724). Plaintiff testified that the day after a nightmare he was distracted, he experienced feelings of futility, he felt as if he did not care, he was "hard" on himself, and he attempted to "put it out of [his] mind, but it won't go away." Plaintiff stated "these memories . . . [kept] jumping into [his] mind when they want[ed] to, not when [he] want[ed] them to." Plaintiff stated when he was last working in September 2000, he was not interacting with his co-employees, except when absolutely necessary and except for "a couple of girls" with whom he used to "talk to a bit." Plaintiff testified he was "estranged" from two of his four siblings, his ex-wife, and his two children (R. 725). Plaintiff stated that his "concentration was difficult" around September, 2000 (R. 726).

Plaintiff testified that he "treated people bad" when he operated the restaurant and that his treatment of these people caused them to quit (R. 728). Plaintiff stated he always had to be at the restaurant when it was open and he always "had to watch what they [his employees] were doing."

17

Dr. Crain testified this behavior was "hyper vigilance," which was caused by Plaintiff not being able to trust anyone. This, according to Dr. Crain, "really showed PTSD." Dr. Crain also opined Plaintiff's assertion that he harbored feelings of not caring the day after a nightmare was "detachment," which was "very characteristic of the condition" of PTSD (R. 729).

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ DeSteno made the following findings:

1. The claimant last met the insured status requirements for Title II of the Act on December 31, 2001 (DLI).

2. The claimant has not engaged in substantial gainful activity since September 6, 2000.

3. Regarding steps two and three, the evidence establishes the existence of a "severe" impairment involving degenerative disc disease and spondylosis of the lumbar spine on and prior to the DLI, but does not disclose medical findings which meet or equal in severity, the clinical criteria of any impairment listed in Appendix 1, Subpart P to Regulations No. 4. The evidence fails to establish that the claimant's depression and anxiety constituted "severe" impairments on or prior to the DLI.

4. The claimant's subjective complaints of disabling pain and other symptoms and limitation precluding all significant work activity on or prior to the DLI are not credited or supported by the evidence.

5. The claimant's residual functional capacity, on and prior to the DLI, was limited to performing medium work.

6. The claimant had, on and prior to the DLI, the residual functional capacity to perform his past relevant work.

7. The claimant has not been disabled as defined by the Social Security Act and its regulations for Title II purposes.

### IV. DISCUSSION

#### A. Scope of Review

18

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1.     The ALJ's finding that there was no evidence that a severe mental impairment existed prior to December 31, 2001, is not supported by the rulings and case law.

2.     The ALJ erred in not granting controlling weight under SSR 96-2p to the retrospective opinions of the treating psychiatrist.

3.     The ALJ erred by failing to afford proper weight to the retrospective medical

opinions of Dr. Albert G. Mylod.

4.  The Appeals Council's failure to address new and material evidence and explain its refusal to review the ALJ's decision in light of that evidence constitutes reversible error.

The Commissioner contends:

1.  The medical records do not support Plaintiff's claim that he had a severe mental impairment during the relevant fifteen-month time period, September 6, 2000, his alleged onset, to December 31, 2001, his date last insured.

2.  Dr. Opdyke's findings do not support disability.

3.  Dr. Mylod's testimony does not support disability.

4.  Plaintiff's interim evidence is irrelevant.

## C. Severe Mental Impairment Prior to DLI

Plaintiff contends the ALJ's finding that no evidence of his severe mental impairment existed prior to December 31, 2001, is not supported by the rulings and case law. Defendant argues medical records do not support Plaintiff's claim that he had a severe mental impairment during the relevant fifteen-month time period, September 6, 2000, his alleged onset, to December 31, 2001, his DLI.

The ALJ found the following relative to Plaintiff's PTSD:

The claimant's post traumatic stress disorder (PTSD) cannot be established as a medically determinable severe impairment until April 2002 when he first sought treatment. Even if it may be inferred that some symptoms were present on and prior to the DLI, it cannot be established that they had greater than a slight or minimal effect on his ability to perform basic work activities on or prior to the DLI (R. 17).

Plaintiff argues that the retrospective opinions of Drs. Opdyke and Crain are sufficient under Fourth Circuit law to establish Plaintiff suffered from a severe impairment prior to December 31, 2001, because their opinions corroborate each other and because little time passed between the DLI and the onset of treatment that these doctors could reasonably rely on the "huge volume of records

that were created when [Plaintiff] entered into 13 months of inpatient mental health care just four

months after his . . . date of last insured expired" (Plaintiff brief at p. 13). The retrospective opinion

of Dr. Opdyke to which Plaintiff refers was offered on January 22, 2003, while Plaintiff was a patient

at a VA Medical Center. Dr. Opdyke opined the following:

> Although he [Plaintiff] has managed to cope these many years with the disorder, the
> symptoms, ie: chronic depression, anger, isolation, self-medication, difficulty
> sleeping, nightmares, anxiety, etc., have caused him many serious difficulties during
> the time since Viet Nam. It is my opinion that most recently the disorder and lower
> back pain had a significant influence in the loss of his last job, and played a major
> roll in his inability to become reemployed. I believe that [Plaintiff] should have been
> admitted to this hospital several years ago for treatment, but no later than the end of
> the year 2000.
>
> It doesn't surprise me that [Plaintiff] didn't enter treatment until April of 2002, as
> people with this illness have a tendency to "tough out" the difficulty times trying to
> appear normal (R. 127).

The retrospective opinion of Dr. Crain to which Plaintiff refers in his brief was that Plaintiff

should have sought and received treatment for PTSD earlier than April 2002, probably when he was

last employed in September, 2000. Dr. Crain opined that Plaintiff was experiencing intense

nightmares, flashbacks, insomnia, difficulties with concentration and difficulty with social

interaction in September, 2000 (R. 717). Dr. Crain testified Plaintiff first developed PTSD in 1995

or 1996 and it became disabling in September, 2000 (R. 718-19).

Relative to these retrospective opinions, the ALJ provided no significant weight to the

opinion of Dr. Crain and he did not assign weight to the opinion of Dr. Opdyke (R. 17, 13-20).

Plaintiff asserts in his argument that the Fourth Circuit has addressed the issue of

retrospective opinions in the case of *Wooldridge v. Bowen*, 816 F.2d 157, 160, in which it held

medical evaluations made after the DLI "are not automatically barred" and that the opinion of a

physician who was a member of the staff who treated Plaintiff from the onset of her condition should be considered, even though that opinion, for the most part, was based on Plaintiff's medical history.

Plaintiff points to the similarities between *Wooldridge*, *supra*, and the instant case – both Plaintiffs worked, neither sought treatment until after their dates last insured, treating physicians wrote a letters based on medical histories and severity of illnesses once treatments began, and both ALJ's denied the claims because there was no finding of severe impairments prior to the DLI. One factor in the instant case differs from the *Wooldridge* case – the retrospective opinions were not offered by treating physicians. The physician in *Wooldridge*, *supra*, who offered the retrospective opinion was part of the staff of doctors who had treated Ms. Wooldridge from the beginning of her symptoms. Such is not the case here. In *Wilkins v. Secretary*, 953 F.2d 93 (1991) the Fourth Circuit specifically identified who could offer a retrospective opinion. It wrote: "This court has recognized that a treating physician may properly offer a retrospective opinion on the past extent of an impairment. *See Wooldridge v. Bowen*, 816 F.2d 157, at 160 (4th Cir. 1987)." Neither Dr. Opdyke nor Dr. Crain were Plaintiff's treating physicians. The record of evidence contained no treatment notes and did not identify Dr. Opdyke as Plaintiff's treating physician. She offered an opinion of Plaintiff's condition and completed a Mental Impairment Questionnaire on January 22, 2003 (R. 127-30). On January 22, 2003, Dr. Opdyke noted she saw Plaintiff "intermittently" from July 30, 2002, until September 10, 2002 (R. 128). Dr. Crain had no treating physician relationship with Plaintiff. He testified at the administrative hearing and interviewed Plaintiff prior thereto (R. 712). Dr. Crain based his opinions on what Plaintiff told him during that interview and upon a review of the medical records and not any knowledge he may have gleaned from serving as Plaintiff's treating physician (R. 712-19).

Furthermore, the record itself does not contain evidence to support Plaintiff's contention that he suffered from a severe impairment prior to December 31, 2001. To be "severe," an impairment must significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c), 416.920(c). "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b), 416.921(b).

As noted by the ALJ, Plaintiff's basic work activities were no more than slightly or minimally limited due to an impairment prior to his DLI according to the evidence of record. There is no evidence that Plaintiff's physical functions were impaired. As noted by the ALJ, on September 6, 2000, Dr. Cohen released Plaintiff to work (R. 14-15, 196). There is no evidence that Plaintiff's capacities for seeing, hearing, and speaking were impaired. Plaintiff testified that he owned his own a package good restaurant from 1978 until the early nineties, when he converted that established into a restaurant, which he sold in 1997. Throughout this time, Plaintiff supervised employees, bartended, cooked, waited tables, bussed tables (R. 701-02). Until September, 2000, Plaintiff was a materials controller, a job for which he was responsible for shipping, documenting, running electronic tests on equipment, and inspecting products (R. 700). Plaintiff testified he sought employment throughout 2001 and ceased that endeavor in early 2002 when he became "frustrated with the job search" (R 706-07). During this period of time during which Plaintiff worked and searched for employment, he did not demonstrate an impairment as to 1) understanding, carrying out,

23

and remembering simple instructions; 2) his use of judgment; 3) his ability to responded appropriately to supervision, co-workers and usual work situations; and/or 4) his dealing with changes in a routine work setting. Plaintiff's basic work abilities were not significantly limited by any mental health impairment. Further, the Fourth Circuit has held, in *Cauthen v. Finch*, 426 F.2d 891 (1970), that when a claimant's medical condition "is one of long standing and that claimant has worked regularly for many years," . . . "that claimant is not entitled to social security disability benefits."

In addition to Plaintiff's work abilities not being limited by PTSD, except for the evidence of marital counseling presented to the Appeals Council, the record does not contain any evidence that Plaintiff sought any treatment for mental health care prior to his DLI (R. 544-676) (*see* this Report and Recommendation pp. 31-36). Additionally, those medical records were relative to Plaintiff's alcohol addiction and marital situation as opposed to treatment for PTSD.

For the reasons stated above, the undersigned finds the ALJ did not err in finding Plaintiff did not have a severe mental impairment prior to his DLI and his decision is supported by substantial evidence.

### D. Controlling Weight to Treating Psychiatrist

Plaintiff contends the ALJ erred in not affording controlling weight to the retrospective opinion of Dr. Opdyke as mandated in SSR 96-2p. Defendant argues Dr. Opdyke's findings do not support disability.

SSR 96-2p provides as follows:

> Controlling weight. This is the term used in 20 CFR 404.1527(d)(2) and 416.927(d)(2) to describe the weight we give to a medical opinion from a treating source that must be adopted. The rule on controlling weight applies when all of the

following are present:

1. The opinion must come from a "treating source," as defined in 20 CFR 404.1502 and 416.902. Although opinions from other acceptable medical sources may be entitled to great weight, and may even be entitled to more weight than a treating source's opinion in appropriate circumstances, opinions from sources other than treating sources can never be entitled to "controlling weight."

2. The opinion must be a "medical opinion." Under 20 CFR 404.1527(a) and 416.927(a), "medical opinions" are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight. (See SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner.")

3. The adjudicator must find that the treating source's medical opinion is "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques. The adjudicator cannot decide a case in reliance on a medical opinion without some reasonable support for the opinion.

4. Even if well-supported by medically acceptable clinical and laboratory diagnostic techniques, the treating source's medical opinion also must be "not inconsistent" with the other "substantial evidence" in the individual's case record.

If any of the above factors is not satisfied, a treating source's opinion cannot be entitled to controlling weight.

A review of the record in this case reveals that Dr. Opdyke completed a Mental Impairment Questionnaire of Plaintiff on January 22, 2003, while he was a patient at a VA Medical Center. This questionnaire offered diagnoses of chronic PTSD, alcohol dependence, hypertension, chronic low back pain, obesity, and a GAF of forty-one. Dr. Opdyke found Plaintiff experienced mood disturbances, substance dependence, social withdrawal, isolation, flat affect, intrusive recollection of traumatic experiences, and hostility, and irritability. Dr. Opdyke found Plaintiff's speech was relevant and coherent, he was cooperative, he had no psychomotor abnormalities, and his affect was dysphoric and blunted (R. 129). Dr. Opdyke opined Plaintiff's prognosis was fair and his impairment could cause him to be absent from work for up to three times per month (R. 130-31). The record also contains a document written that same date by Dr. Opdyke relative to Plaintiff's

condition. She opined Plaintiff was "unemployable ... at least for the present and the foreseeable future." Dr. Opdyke wrote Plaintiff had managed to cope with "the disorder, the symptoms, ie: chronic depression, anger, isolation, self-medication, difficulty sleeping, nightmares, anxiety, etc." She opined the combination of Plaintiff's disorder and lower back pain contributed to the loss of his last job and "played a major roll in his inability to become reemployed." Additionally, Dr. Opdyke expressed the opinion that she "believe[d] that [Plaintiff] should have been admitted to this hospital several years ago for treatment, but no later than the end of the year 2000." Dr. Opdyke wrote that she was not "surprise[d]" that Plaintiff did not enter treatment earlier than he did, "as people with this illness have a tendency to 'tough out' the difficult times trying to appear normal" (R. 127).

20 C.F.R. 404.1502 defines "treating source" as follows:

> *Treating source* means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

The questionnaire and the letter are the extent of the evidence presented by Dr. Opdyke. On January 22, 2003, Dr. Opdyke noted Plaintiff was "seen intermittently" from July 30, 2002, through September 10, 2002, by her. She neither provided ongoing treatment nor illness-appropriate treatment at long intervals to qualify as his treating psychiatrist. The ALJ, therefore, had no reason

to recognize Dr. Opdyke as Plaintiff's treating psychiatrist or obligation to assign controlling weight to Dr. Opdyke's opinion.

Plaintiff's argument that the instant case is comparable to the case of *Wooldridge*, *Id.*, is without merit. In *Wooldridge*, the Fourth Circuit found "[i]t was error not to give any weight to a physician's retrospective report that claimant had been disabled" prior to the date of last insured. *Id* at 157. As noted in a previous discussion in this Report and Recommendation/Opinion, there is a distinct difference between the facts of the *Wooldridge* case and the instant case: the physician who offered a retrospective opinion as to Wooldridge's condition was identified as a member of the staff who had treated Wooldridge from the onset of her symptoms; Dr. Opdyke was not Plaintiff's treating physician. Additionally, in the case *Wilkins*, *Id.*, the Fourth Circuit held that a "treating physician may properly offer a retrospective opinion on the past extent of an impairment" and that, as such, the opinion of a treating physician "is entitled to great weight" quoting *Wooldridge* 816 F.2d at 160; *Mitchell v. Schweiker*, 699 F.2d, 185, 197, (4th Cir. 183). The evidence of record contained one Mental Impairment Questionnaire completed by Dr. Opdyke as to Plaintiff and one document titled "Comments" (R. 127-31). Both were dated January 22, 2003. There were no treatment notes, no medical evidence, no results of clinical and laboratory diagnostic testing administered by Dr. Opdyke, or any other type of evidence that would indicate that Dr. Opdyke served as Plaintiff's treating psychiatrist. The record contained psychiatric treatment notes of Dr. Hyun K. Lee, Dr. Alina D. Vrinceanu, Dr. Ami Patel, and Dr. George Roy, who treated Plaintiff for extended periods of time while he was a patient at the VA Medical Center; none of these doctor's offered a retrospective opinion (R. 144-49, 167, 274). The undersigned finds the ALJ did not err in not assigning controlling weight to the opinion of Dr. Opdyke and that substantial evidence supports the ALJ in his decision.

## E. Weight to Retrospective Medical Opinion

Plaintiff argues that the ALJ erred by failing to afford proper weight to the retrospective medical opinions of Dr. Albert G. Mylod. Defendant contends Dr. Mylod's testimony does not support disability.

The ALJ found the following relative to Dr. Mylod:

> No significant weight is accorded to the residual functional capacity assessment and inferences of disability of Dr. Albert G. Mylod, Jr., presented at the hearing. As was the case with Dr. Crain, Dr. Mylod also was called as a witness by the claimant to support the claim, and is not a treating physician. He testified that the claimant' [sic] residual functional capacity was sedentary or less on and prior to the DLI, but such a limited RFC is not supported by the medical evidence or any reasonable inference of limitation on or prior to the DLI. His expert opinion is that of a non-examining source. Because non-examining sources have no examining or treating relationship with the claimant, the weight given to their opinions will depend on the degree to which they provide supporting explanations for their opinions. I must evaluate the degree to which these opinions consider all of the pertinent evidence, including opinions of treating and other examining sources. 20 CFR 404.1527(d). Medical source opinions on matters such as meeting or equaling the criteria of a listed impairment and residual functional capacity are matters reserved to the Commissioner, although I must carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner. 20 CFR 404.1527(3). Such opinion of residual functional capacity on and prior to the DLI was not satisfactorily supported by the doctor, and it is not supported by the objective record evidence. As noted above, the claimant testified that he continued to look for work through September 2001, at which time, he only ceased due to frustration with his lack of success in finding employment. Thus, the claimant clearly felt that he was capable of working through his DLI (R. 18-19).

The ALJ's decision is supported by substantial evidence. Dr. Mylod's retrospective opinion was not supported by the objective record of evidence and a retrospective opinion may be assigned weight if it is provided by a treating physician, not a non-examining physician, which is the status of Dr. Mylod in this case.

Dr. Mylod testified at the administrative hearing that Plaintiff's shoulder injury occurred prior

to his DLI because there was no major trauma to his shoulder between his DLI and his first admission to the VA Medical Center to cause his symptom. Additionally, Dr. Mylod testified Plaintiff's back condition could have occurred in 2000 (R. 721-22). This opinion was generated through Dr. Mylod's interview of Plaintiff and was not supported by the evidence of record (R. 720).

The records contained evidence of Plaintiff's back condition prior to his DLI. On August 18, 2000, Dr. Cohen evaluated Plaintiff for a work-related injury. Plaintiff reported he had injured himself lifting five-gallon pails. Plaintiff's gait was normal; he could toe/heel walk; his lumbosacral spine range of motion was good; he had no pain from flexion to extension; he could squat; his motor exam was 5/5; and his straight leg raising test was negative (R. 194-95). Plaintiff's x-ray revealed a degenerative disc at L5-S1 and Dr. Cohen diagnosed low back pain syndrome, which aggravated his preexisting arthritis "without focal neurological deficus entrapment." Dr. Cohen recommended Plaintiff lose weight, exercise at home, and undergo a short course of physical therapy to treat his condition (R. 195). On September 6, 2000, Dr. Cohen opined Plaintiff had made significant improvements and had no significant neurological problem. Dr. Cohen found Plaintiff had degenerative disc disease, which was "resolved and stable." Dr. Cohen found Plaintiff could return to work (R. 196). The ALJ considered this opinion in his decision (R. 14-150). Dr. Cohen's opinion supports the ALJ's decision that Dr. Mylod's opinion as to Plaintiff's RFC on and prior to the DLI was not satisfactorily supported by the objective record evidence.

Plaintiff himself offered evidence as to his ability to work prior to his DLI. After Plaintiff last worked in September 2000 and prior to December 31, 2001, Plaintiff's DLI, he testified he "started a job search in November or December" of 2000, which "continued for the entire year." Plaintiff testified he became "pretty frustrated with the job search" and did not pursue that activity

in "early 2002" (R. 707). This statement supports the ALJ's finding that Plaintiff "clearly felt that he was capable of working through his DLI," but did not only "due to frustration with his lack of success in finding employment" (R. 19).

On May 15, 2002, Plaintiff reported his shoulder pain had started in January 2002, which was past his date last insured (R. 260). Additionally, after Plaintiff's DLI, the record does not contain evidence that his back and shoulder impairment was severe or significantly limited his ability to do work. The following is a treatment history at the VA Medical Centers:

- On April 23, 2002, the VA Medical Center report read that Plaintiff ambulated with a steady gait and denied any pain or discomfort (R. 169).

- On May 14, 2002, Plaintiff was observed to have good motor activity, normal gait and good extremity strength (R. 252-53, 257).

- On May 20, 2002, an x-ray of Plaintiff's left shoulder showed soft tissue calcification (R. 173).

- On June 24, 2002, Plaintiff reported he could "walk as far as he want[ed]" (R. 299).

- A June 26, 2002, MRI of Plaintiff's lumbar spine revealed a small disc herniation of L4-5 and mild degenerative changes (R. 172, 309, 313).

- On July 11, 2002, an examination of Plaintiff's lumbar spine revealed no tenderness upon palpation, limited range of motion, pain with flexion, and intact sensation (r. 309). Plaintiff was instructed to undergo physical therapy (R. 310).

- On July 15, 2002, Plaintiff reported reduced lower back pain due to physical therapy (R. 311).

- On July 29, 2002, the VA Medical Center records contained notations that Plaintiff's physical condition was fair; his activity was ambulant; his mobility was full; he required the use of no assistive devices; and he required no assistance with his activities of daily living (R. 331).

- During January, 2003, Plaintiff reported increased stiffness, soreness, and pain in his back (R. 125-26).

- During February, 2003, Plaintiff was released to swim, bowl, bicycle, and participate

30

in activities at the wood shop and fitness center after his left shoulder (post surgery) and lower back were evaluated (R. 497).

The record of care from this period of time does not contain any opinion from any treating physician that Plaintiff's condition precluded or limited him from performing work. To the contrary, he was released, in February, 2003, to partake in activity.

Finally, In *Wilkins*, *Id*. at 96, the Fourth Circuit held "that a treating physician may properly offer a retrospective opinion on the past extent of an impairment" quoting *Wooldridge*, *Id*. at 160. Dr. Mylod was not a treating physician. He was a witness hired by Plaintiff to testify at the administrative hearing. He had never examined Plaintiff. He had interviewed Plaintiff prior to the administrative hearing. Based on this fact alone, the ALJ was not required to assign weight, significant or otherwise, to the opinion of Dr. Mylod.

Based on the above analysis, the undersigned finds substantial evidence supports the decision of the ALJ to provide no significant weight to the retrospective opinion of Dr. Mylod.

### F. Appeals Council

Plaintiff contends the Appeals Council's failure to address new and material evidence and explain its refusal to review the ALJ's decision in light of that evidence constitutes reversible error. Defendant argues Plaintiff's interim evidence is irrelevant.

The evidence to which Plaintiff refers in his argument is found in the treatment notes from the Mount Kemble Center for Addictive Illnesses and Morristown Memorial Hospital. Specifically, Plaintiff referred to the following notation in the counselor's files:

> Additionally, the counselor noted Plaintiff "also touched on some anger which he has been harboring for years, going back to the Vietnam War. Also some fairly strong feelings of guilt. [Plaintiff] has never discussed these feelings with anyone, thinks he can keep them buried, and he referred to alcohol as one what that worked for him for a long time in helping him avoid facing these feelings" (R. 672).

31

Plaintiff contends the Appeals Council is required to explain the weight it afforded this new and material evidence and it failed to do so. In its denial of Plaintiff's request for review of the ALJ's decision, the Appeals Council wrote it had "considered the reasons [Plaintiff] disagree[d] with the decision [of the ALJ] and the additional evidence listed on the enclosed Order of the Appeals Council [which included the above noted evidence]. We found that this information does not provide a basis for changing the Administrative Law Judge's decision" (R. 5-6).

In *Wilkins*, the Fourth Circuit determined that the Appeals Council *will consider* evidence submitted to it if the evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision. *Wilkins* further defined the terms "new" and "material" as follows:

> Evidence is new . . . if it is not duplicative or cumulative . . . .
> Evidence is material if there is a reasonable possibility that the new
> evidence would have changed the outcome.

*Id.* at 96.

The undersigned finds the 1994 evidence regarding Plaintiff's feelings of anger and guilt is "new" and relates to the period of time on or before the date of the ALJ's 2004 decision.

Pursuant to 20 CFR § 404.970(b), the Appeals Council shall consider evidence submitted with a request for review if the evidence is new, material, and relates to the period on or before the dates of the ALJ's decision. As a threshold matter, Plaintiff argues "if the Appeals Council ostensibly considers the new interim evidence in denying review of the claim, it is incumbent on the Appeals Council to give some reason for finding that the interim evidence does not justify further administrative action" citing *Alexander v. Apfel*, 14 F. Supp. 2d 839, 843 (W. D. Va. 1998) (Plaintiff's brief at p. 21). The undersigned recognizes this issue has generated conflicting opinions in the District Courts of the Fourth Circuit. First, the regulations do not require the Appeals

Council to state its rationale for denying review. See 20 C.F.R. § 404.970(b). Second, *Alexander* is of questionable precedential value, as it is a decision from another district, the Western District of Virginia. Third, in an unpublished opinion decided after *Alexander*, the Fourth Circuit specifically rejected the contention that the Appeals Council must articulate its own assessment of the additional information. See *Hollar v. Commissioner of Social Security*, 194 F.3d 1304 (4th Cir. 1999)(unpublished), cert. denied, 120 S. Ct. 2228 (2000) (citing *Browning v. Sullivan*, 958 F. 2d 817 (8th Cir. 1992), 20 C.F.R. § 404.970(b)). cf., *Harmon v. Apfel*, 103 F. Supp. 2d 869 (D.S.C. 2000) (court declined to follow *Hollar* and instead required the Appeals Council to articulate its reasoning in declining review where new evidence was submitted.). Finally, a subsequent decision in the Western District of Virginia concluded the exact opposite of the magistrate judge in *Alexander*. In *Ridings v. Apfel*, 76 F. Supp. 2d 707 (W.D. Va. 1999), which was decided after *Alexander*, District Judge Jones held that the Appeals Council was not required to state its reasons for finding that the new evidence did not justify review of the ALJ's decision. Judge Jones expressly disagreed with the magistrate judge's reasoning that the Appeals Council must give a detailed assessment of its failure to grant review in the face of new evidence, citing *Hollar*.[1]

Despite holding that the Appeals Council was not required to articulate its reasoning for denied review, Judge Jones affirmed the magistrate judge's recommendation that Ridings' claim be remanded to the Commissioner, because "substantial evidence [did] not support the ALJ's decision, when reviewed along with [the new evidence]." *Id.* at 709. In other words, the Court reviewed the new evidence along with the evidence submitted to the ALJ in making its decision,

---

[1]Judge Jones did cite *Alexander* in a footnote, stating: "At least one other magistrate judge of this district has held that the Appeals Council must articulate some reason for finding that the new evidence does not justify review." *Id.* at n.6.

33

which was the manner in which the Fourth Circuit decided *Wilkins, Id.*:

> Because the Appeals Council denied review, the decision of the ALJ became the final decision of the Secretary. "Reviewing courts are restricted to the administrative record in performing their limited function of determining whether the Secretary's decision is supported by substantial evidence." The Appeals Council specifically incorporated [the new evidence] into the administrative record. Thus, we must review the record as a whole, including the new evidence, in order to determine whether evidence supports the Secretary's findings.

Therefore, where the Appeals Council considered the new evidence and included it in the record but denied review, the Fourth Circuit holds that the review court should consider the record as a whole, including the new evidence, in order to determine whether the ALJ's decision is supported by substantial evidence.

The undersigned has already opined this evidence was new and related to the time period on or before the decision of the ALJ. The undersigned must now consider if the evidence in question would have changed the decision of the ALJ (R. 672).

As noted earlier, the ALJ found the following relative to Plaintiff's psychological condition:

> The claimant's post traumatic stress disorder (PTSD) cannot be established as a medically determinable severe impairment until April 2002 when he first sought treatment. Even if it may be inferred that some symptoms were present on and prior to the DLI, it cannot be established that they had greater than a slight or minimal effect on his ability to perform basic work activities on or prior to the DLI. Thus, at his initial visit to the VA Hospital on April 19, 2002, he was noted to be suffering from only mild depression, no suicidal thoughts, and his insight and judgment were assessed as normal. The PTSD solely involves his experiences in Vietnam decades ago and he worked at competitive employment for many years since then, including managing his own store and restaurant (R. 17).

The ALJ evaluated the evidence of record to conclude that Plaintiff's PTSD was not severe and did not severely limit his ability to perform basic work activities. He evaluated the evidence contained in the records of the VA Medical Hospital; specifically, that his symptoms were mild and his functioning was within the normal range. The ALJ also noted Plaintiff's PTSD involved

Plaintiff's decade-old Vietnam experiences and had not interfered with his ability to work from 1978 through 2000 (R. 17, 700-04).

The new evidence is from 1992 through 1994. In February, 1992, Plaintiff was discharged from Morristown Memorial Hospital with a diagnosis of alcohol dependency (R. 545). His behavior was appropriate, he was oriented, his mood and affect were normal, his thought process and content were normal, his memory was intact, his intellect was average, he had no psychotic processes, and his judgment, insight, and impulse control were adequate (R. 596). Subsequent to his hospital stay, Plaintiff received counseling. Although Plaintiff quoted only entry from almost two years of counseling sessions in his argument, there are many entries made by the counselor, some of which follow:

- In November, 1992, Plaintiff reported to the counselor he was expanding his business and this project kept him "fully occupied" (R. 637).

- Plaintiff stated he was fulfilling a long-time dream with the expansion of his business (R. 637).

- Plaintiff reported he "enjoy[ed] cooking and look[ed] forward to being able to do so creatively for profit (R. 637).

- In December, 1992, Plaintiff reported he was "feeling good mentally and physically" (R. 638).

- In September, 1993, Plaintiff was charged with driving under the influence; his counselor noted he did not accept responsibility for his actions and blamed "the system" (R. 646).

- In December, 1993, Plaintiff was sentenced to a jail term with a work release for his DUI conviction (R. 567-58).

- In January, 1994, Plaintiff reported he was depressed because he was unhappy in his marriage and his business was doing poorly (R. 667).

- Plaintiff relapsed in February, 1994 (R. 667).

- Plaintiff began attending AA meetings in May, 1994 (R. 670).

- In May, 1994, Plaintiff "touched on some anger which he [had] been harboring for years, going back to the Vietnam War" and he expressed some strong feelings of guilt. Plaintiff did not discuss his feelings with others and used alcohol as a way to "keep them buried" (R. 672).

- Plaintiff relapsed in October 1994 (R. 676).

The new evidence from Plaintiff's counselor indicated Plaintiff was able to work despite his consuming alcohol, his arrest for driving under the influence, and his report of feeling depressed, angry, and guilty. This is not persuasive evidence that Plaintiff's PTSD was a severe impairment or that it severely limited his ability to perform basic work activities prior to his DLI. The Plaintiff himself admits that he was working during this period of time. He was expanding his business, he was cooking, he was "fully occupied" in his business (R. 637). The undersigned, therefore, concludes, that new evidence submitted to the Appeals Council would not have changed the ALJ's determination and that the ALJ's decision is supported by substantial evidence.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **GRANTED**, and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right

to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this __8__ day of _January_ 2007.

_____
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE

194 F.3d 1304 (Table)
**Unpublished Disposition**

**(Cite as: 194 F.3d 1304, 1999 WL 753999 (4th Cir.(N.C.)))**

▷
NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA4 Rule 36 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Fourth Circuit.

Donna E. HOLLAR, Plaintiff-Appellant,
v.
COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, Defendant-Appellee.

No. 98-2748.

Submitted July 30, 1999.
Decided Sept. 23, 1999.

Appeal from the United States District Court for the Western District of North Carolina, at Statesville, No. CA-96-138-5-V; Richard L. Voorhees, District Judge.

Donna E. Hollar, Appellant Pro Se.

Joseph L. Brinkley, Office Of The United States Attorney, Charlotte, North Carolina, for Appellee.

Before WIDENER and MOTZ, Circuit Judges, and BUTZNER, Senior Circuit Judge.

OPINION

PER CURIAM.

**\*1** In this case, the Commissioner of Social Security found that Donna E. Hollar was disabled from December 30, 1990 to June 12, 1992, when her disability ceased. Hollar now appeals the district court's order upholding the Commissioner's decision. We affirm.

Hollar alleged that she became disabled on December 30, 1990 due to complications from an automobile accident. Her application was denied initially and on reconsideration. After the ALJ issued his decision, Hollar sought review before the Appeals Council. The Appeals Council considered additional evidence submitted by Hollar but found that the evidence did not provide a basis for changing the ALJ's decision. The ALJ's decision therefore became the final decision of the Commissioner.

Hollar then filed the subject action in the district court. See 42 U.S.C. § 405(g) (1994). A magistrate judge found that substantial evidence supported the Commissioner's decision. Hollar, through counsel, objected to the magistrate judge's findings. The district court found her objections to be without merit, adopted the recommendation of the magistrate judge, and entered summary judgment for the Commissioner. Hollar timely appeals.

We review the Commissioner's decision to determine whether it is supported by substantial evidence and whether the correct law was applied. See Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990). In this case, our review is further restricted to consideration of the two issues that counsel raised in the objections to the magistrate judge's report. See Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir.1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.1984). In her objections, Hollar complained that the Appeals Council failed to consider and make explicit findings concerning the evidence submitted in support of her claim after the ALJ's decision. Second, Hollar contended that the magistrate judge erred in conducting a de novo review of the evidence, including the additional evidence submitted to the Appeals Council.

The Appeals Council in its decision did not engage in extensive analysis of the additional evidence but simply identified the evidence, stated that it had considered the evidence, and concluded that the evidence did "not provide a basis for changing the Administrative Law Judge's decision." At least one court of appeals has specifically rejected the claim that the Appeals Council must "articulate its own assessment of the additional evidence." Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir.1992). We agree with this conclusion and

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

further note that the regulation addressing additional evidence does not direct that the Appeals Council announce detailed reasons for finding that the evidence did not warrant a change in the ALJ's decision. *See* 20 C.F.R. § 404.970(b) (1999).

**\*\*2** In her second objection, Hollar contended that the magistrate judge erroneously engaged in a de novo review of the additional evidence. To the contrary, the magistrate judge correctly analyzed the entire record. He found that substantial evidence supported the Commissioner's decision and that the additional evidence submitted to the Appeals Council did not change his finding. *See Browning,* 958 F.2d at 822-23.

Our review of the record and the district court's opinion adopting the recommendation of the magistrate judge discloses no reversible error. We therefore affirm on the reasoning of the district court. *See Hollar v. Commissioner,* No. CA-96-138-5-V (W.D.N.C. Sept. 18, 1998). [FN\*] We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

> FN\* Although the district court's judgment or order is marked as "filed" on September 17, 1999, the district court's records show that it was entered on the docket sheet on September 18, 1999. Pursuant to Rules 58 and 79(a) of the Federal Rules of Civil Procedure, it is the date that the judgment or order was entered on the docket sheet that we take as the effective date of the district court's decision. *See Wilson v. Murray,* 806 F.2d 1232, 1234-35 (4th Cir.1986).

*AFFIRMED*

194 F.3d 1304 (Table), 1999 WL 753999 (4th Cir.(N.C.)), Unpublished Disposition

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works